JOHN DUPLER,

        Plaintiff,

v.                                      Case No. 3:16-cv-191-J-34MCR

MARK HUNTER, Sheriff of Columbia
County, Florida, in his official capacity; and
KEITH SPRADLEY,

        Defendants.

_____/

## ORDER

    **THIS CAUSE** is before the Court on Defendants' Motion for Final Summary Judgment and Memorandum of Law (Doc. 21; Motion), filed on December 15, 2016. Plaintiff filed a response to the Motion on January 27, 2017. See Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment (Doc. 26; Response). Accordingly, this matter is ripe for review.

## I.    Background[1]

John Dupler is a 5'4" tall 150 lb male with some level of mental impairment related to in utero oxygen deprivation.  See Motion, Ex. 1: Offense Report at 1; Response, Ex. A: Deposition of John Dupler (Dupler Dep.) at 59.  On May 15, 2012, at approximately 1:00 a.m., Dupler who had finished his shift as a custodian at Florida Gateway College, located at 149 SE College Place, Lake City, Florida, began driving to his house, located at 294 SE Mulberry Place, Lake City, Florida.  See Dupler Dep. at 21, 25, 27.  While driving west on County Road 252, Dupler passed Deputy David Keith Spradley Jr. (Deputy Spradley) who was driving east on County Road 252 in a marked law enforcement vehicle.  See Response, Ex. B: Deposition of David Keith Spradley (Spradley Dep.) at 9, 25.  Although Dupler did not notice Deputy Spradley, see Dupler Dep. at 27, Deputy Spradley believed that Dupler saw him because Dupler hit his brakes when he passed Deputy Spradley, as one typically does when one sees a police vehicle, see Spradley Dep. at 14.

According to Deputy Spradley, Dupler's tag light and back left brake light were not functioning.  Id. at 12-13.  Although Dupler acknowledged that his brake light was out, see Dupler Dep. at 25, he believed his tag light may have been operational, but could not say that he knew it was, id. at 22-23.  Regardless, Deputy Spradley turned his vehicle around and pulled up behind Dupler at a red light at the corner of County Road 252 and

---

[1]    Because this case is before the Court on Defendants' Motion, the facts recited herein, and all reasonable inferences therefrom, have been viewed by the Court in a light most favorable to Plaintiff.  See T-Mobile S. LLC v. City of Jacksonville, Fla., 564 F. Supp. 2d 1337, 1340 (M.D. Fla. 2008); see also Jenkins by Hall v. Talladega City Bd. of Educ., 115 F.3d 821, 822 (11th Cir. 1997) ("For the limited purpose of our analysis of the issue of qualified immunity at the summary judgment stage, we are bound to view the facts in the light most favorable to the plaintiffs.").  Additionally, the Court notes that the facts before the Court in this case are for the most part undisputed and any disagreement has been indicated.

Southeast Country Club Road.  <u>See</u> Spradley Dep. at 13; Dupler Dep. at 25-26.  As soon as the traffic light turned green, Deputy Spradley gave his siren a quick burst and turned on his emergency lights to conduct a traffic stop.  <u>See</u> Spradley Dep. at 13, 16.  Dupler did not notice Deputy Spradley because he had loud rock music playing in his car.  <u>See</u> Dupler Dep. at 27-29, 37.  Dupler drove away from the intersection at a fast enough pace that his engine revved.  <u>See</u> Spradley Dep. at 16.  Although Dupler testified that he did not notice Deputy Spradley until he pulled into his driveway, <u>see</u> Dupler Dep. at 37, he also testified that the headlights behind him were so "blinding" that he switched his rearview mirror into nighttime mode, <u>id.</u> at 31, and did not pull over because he feared flipping into a gully, <u>id.</u> at 27.  Dupler did not speed but continued to drive approximately one quarter of a mile drive from the intersection to his house.  <u>See</u> Spradley Dep. at 1, 13-14; Dupler Dep. at 27-28.  Video of the incident taken from Deputy Spradley's vehicle, <u>see</u> Spradley Dep. at 12,[2] shows that along the way Dupler passed a number of driveways, turned right onto another street, and then left into his own driveway, <u>see</u> Motion, Ex. 2: Video at 1:11:18-1:12:04.  Having turned into the driveway, Dupler still did not immediately stop, and Deputy Spradley can be heard saying "they're still not stopping."  <u>Id.</u> at 1:12:04-1:12:09.  Dupler continued to the end of the driveway, ultimately stopping between a carport with a parked vehicle on his right and a neighboring structure to the left.  <u>Id.</u> at 1:12:18.

---

[2]     Each vehicle of the Columbia County Sheriff's Office contains a camera operated by the Watchguard technology system.  <u>See</u> Spradley Dep. at 10-12.  The sound and sight on the Video taken from Deputy Spradley's vehicle do not perfectly align.  <u>Id.</u> at 30.

Once Dupler stopped, Deputy Spradley pulled up behind him. Id. Dupler then honked his horn twice. See Dupler Dep. at 35; Spradley at 19-20. Although Dupler testified that he frequently honked to let his wife know he was home, see Dupler Dep. at 33; Response, Ex. C: Deposition of Regina Dupler (R. Dupler Dep.) at 13, he later stated that he honked to alert his wife that someone was behind him, see Dupler Dep. at 36. Having stopped behind Dupler, Deputy Spradley took cover behind his police vehicle, displayed his firearm, and repeatedly shouted "let me see your hands" and "put your hands in the air." See Video at 1:12:23-1:12:43; Spradley Dep. at 28-29. Although Dupler testified that he heard Deputy Spradley's orders and complied right away, see Dupler Dep. at 38-39, the Video reflects that Deputy Spradley ordered Dupler to show his hands four times[3] within twenty seconds before Dupler even began to get out of his vehicle, see Video at 1:12:23-1:12:43. During that time, Dupler's head and upper body can be seen moving about on the Video through the back windshield. See generally id. Dupler testified that he initially thought he was supposed to wait in his car. See Dupler Dep. at 38.

When Dupler opened his car door, he still did not immediately exit the vehicle. See Video 1:12:43. Instead, Deputy Spradley again shouted "let me see your hands, put your hands in the air." Id. at 1:12:43-1:12:49. Then, Dupler stood, flashed his palms, asked

---

[3]     Although it appears that Deputy Spradley ordered Dupler to show his hands six times before Dupler began to get out of his vehicle, see Video at 1:12:23-1:12:43, Defendants contend that Deputy Spradley ordered Dupler to show his hands four times before Dupler opened his car door, see Motion at 3. The Court will proceed as though Deputy Spradley gave the order four times because on summary judgment all factual disputes must be resolved in Plaintiff's favor, see Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995), and because the sound and sight on the Video do not perfectly align, see Spradley Dep. at 30.

what he had done wrong, and then dropped his hands back to his sides.  Id.  Dupler

described his own demeanor as calm and non-threatening, see Dupler Dep. at 50,

however Deputy Spradley interpreted Dupler's failure to comply as an act of aggression

and feared that Dupler intended to have a confrontation, see Spradley Dep. at 21, 42-43.

Nevertheless, because Dupler did not have any visible weapons, Deputy Spradley

holstered his firearm and pulled out his Taser.[4]  Id. at 28-29.  According to Deputy

Spradley's training, deployment of a Taser is less likely to result in injury than a physical

altercation with the officer's hands.  Id. at 40. Deputy Spradley explained his thought

process as follows:

> I'm in a high-risk situation.  To me, I've just been in a vehicle pursuit.  We
> entered his property, his territory, things that he's familiar with.  We're in a
> fenced in area.  It's not well lit.  He's blowing the horn, possibly to get other
> people to come outside.  I'm there by myself.  I don't know where my
> backup is.  I'm in a high-risk traffic stop.  And the best place for me, to
> have him, is outside of his vehicle, outside of possible weapons or
> explosives or anything that he may have inside his vehicle, outside on the
> ground, laying down on his stomach until my backup can get there.

Id. at 36-37.

---

[4]        As explained by the Eleventh Circuit:

[t]he term "Taser" refers to an electronic device used to subdue persons without causing
fatal harm.  A Taser is a battery-charged unit approximately the size and appearance of
a flashlight.  It holds two replaceable cartridges, each containing a hooked barb, or dart,
attached to the cartridge by a long, electricity-conducting insulated wire.  Each dart can
be fired independently by depressing the corresponding lever located on the frame of the
Taser.  When the probes make contact with the target, the Taser transmits high voltage
electrical current along the wires and into the body of the target.  In addition, after the
Taser's initial "shot" has been fired and contact has been made, an electrical current may
be transmitted through the wire to the target by repeatedly pressing on the Taser's lever.

Chaney v. City of Orlando, Fla., 483 F.3d 1221, 1223 n.1 (11th Cir. 2007) (citations omitted).

After pulling out his Taser but prior to deploying it, while Dupler was standing alongside the vehicle, Deputy Spradley ordered Dupler to get on the ground. <u>See</u> Video at 1:12:54. Dupler continued to ask what he had done wrong, but did not comply with Deputy Spradley's order. <u>Id.</u> at 1:12:55. Deputy Spradley ordered Dupler to get on the ground one more time before charging at him with his Taser. <u>Id.</u> at 1:12:55-1:13:00. As Deputy Spradley moved toward Dupler and deployed his Taser, Dupler began to lower his body. <u>Id.</u> at 1:13:00. Dupler yelped, said he was sorry, and propped himself up on his hands and feet. <u>See Id.</u> at 1:13:00; Spradley Dep. at 30, 34. Unbeknownst to Deputy Spradley, Dupler began to have a seizure, which did not end until he was released from the jailhouse later that night. <u>See</u> Dupler Dep. at 20. Deputy Spradley continued to shout at Dupler to get on the ground, and Dupler insisted that he did not do anything wrong. <u>See</u> Video at 1:13:00-1:13:05. Deputy Spradley then placed his foot on Dupler's back to bring him fully on the ground. <u>Id.</u> at 1:13:04-05. Although Dupler characterizes Deputy Spradley's act as a "stomp," <u>see</u> Dupler Dep. at 42, Deputy Spradley testified that "[i]t wasn't a forceful push or a kick or anything. It was just a push to get him the rest of the way to the ground," <u>see</u> Spradley Dep. at 30.

At some point Dupler's wife came out to the driveway. <u>See</u> R. Dupler Dep. at 16. Deputy Spradley ordered Dupler to listen to him, stay on the ground, and to put his hands behind his back. <u>See</u> Video at 1:13:09-1:13:20. He did so because Dupler's hands were beneath his body, and Deputy Spradley did not know if Dupler "had a gun in his waistband" or a "knife around his neck." <u>See</u> Spradley Dep. at 37-38. Dupler continued to insist that he had not done anything wrong. <u>See</u> Video at 1:13:22-24. Deputy Spradley

attempted to deploy his Taser again, but instead turned off his Taser when he realized it was not properly working.  <u>See</u> Spradley Dep. at 31-33.

After Deputy Spradley had deployed his Taser, Mrs. Dupler advised Deputy Spradley that Dupler suffers from complex partial seizures.[5]  <u>See</u> R. Dupler at 16; Video at 1:13:26; Dupler Dep. at 8.  Deputy Spradley advised Mrs. Dupler that the incident was being recorded, and directed Mrs. Dupler to go back inside the house twice.  <u>See</u> Video at 1:13:38-1:13:41.  When she did not do so, Deputy Spradley stated that if she failed to comply with his direction, she too would be arrested.  <u>Id.</u> at 1:13:45-1:13:47.  According to Deputy Spradley, he did this because Mrs. Dupler was verbally interfering at the scene, and he only threatened to arrest her as a tactic rather than a serious threat.  <u>See</u> Spradley Dep. at 45.

During the incident, Deputy Spradley deployed his Taser either two or three times.  Although Dupler testified Deputy Spradley tased him three times, <u>see</u> Dupler Dep. at 42-43, and Deputy Spradley questions whether any of his deployments even struck Dupler, <u>see</u> Spradley Dep. at 34, in the motion papers, the parties agree that Deputy Spradley deployed his Taser twice, and that only the first deployment actually struck Dupler.  <u>See</u> Motion at 17-18; Response at 17.

Later in the night, Deputy Spradley learned that Dupler did not have a criminal history, and that he had a valid driver's license.  <u>See</u> Spradley Dep. at 17-18, 27; Video at 1:15:35, 1:19:28-1:19:31, 1:42:57; Offense Report at 2.  At the conclusion of the

---

[5]     A complex partial seizure involves "at least some alteration in consciousness during the seizure event."  2 MOD. SCI. EVID. § 8:29 (2016-2017).  However, "postural functions (ability to sit, stand, etc.) are preserved."  <u>Id.</u>

incident, Deputy Spradley arrested Dupler for vehicular flight pursuant to Florida Statute section 316.1935(2), and for resisting arrest without violence pursuant to Florida Statute section 843.02.  <u>See</u> Offense Report at 1.  Ultimately, the state attorney's office dropped the charges, stating, "Although probable cause existed for the charges herein further pursuit of this matter is not within the interests of justice."  <u>See</u> Response, Ex. D: No Information Filed.

The record is unclear with respect to whether Deputy Spradley complied with Columbia County Sheriff's Office General Order 41.3 (the Order).  Although Deputy Spradley reported the incident as a vehicle pursuit, he does not recall whether he told dispatch to convert the original traffic stop into a pursuit call, as required under the Order. <u>See</u> Spradley Dep. at 53.  Additionally, Deputy Spradley does not believe he advised dispatch of the nature of Dupler's charges.  <u>Id.</u> at 55.  The Columbia County Sheriff's Office did not discipline Deputy Spradley as a result of this incident.  <u>Id.</u> at 56-57.

Dupler suffered physical and emotional injuries as a result of the incident.  <u>See</u> Response at 5.  Physically, Dupler has experienced more frequent seizures, back trauma and numbness in his left leg.  <u>See</u> Dupler Dep. at 44, 46-47.  Additionally, the Taser probes left red marks on him.  <u>Id.</u> at 40-41; R. Dupler Dep. at 27.  Dupler visited his primary care physician once for these injuries, but did not schedule any further visits because his insurance would not cover them.  <u>See</u> Dupler Dep. at 17, 44. Dupler suffered emotionally because his co-workers ridiculed him over the publication of his mug shot. <u>Id.</u> at 53.  Although Dupler acknowledged that he had always been fearful of law

enforcement, <u>id.</u> at 48, he is now dependent on his wife and nephew to drive him to and from work, <u>see</u> R. Dupler Dep. at 22.

Based on these allegations, on February 26, 2016, Dupler filed a four count complaint. <u>See</u> Complaint for Damages and Demand for Jury Trial (Doc. 1;Complaint). In Count I, Dupler alleges that Deputy Spradley violated 42 U.S.C. § 1983 (Section 1983) by executing a false arrest with excessive force, thereby depriving Dupler of his rights under the Fourth and Fourteenth Amendments to the United States Constitution. <u>Id.</u> ¶¶ 56-60. In Count II, Dupler alleges that Sheriff Hunter violated Section 1983 by failing "to institute policies, practices and procedures to ensure against the unlawful arrest and abusive treatment of innocent persons" in violation of the Fourth and Fourteenth Amendments. <u>Id.</u> ¶¶ 61-70. In Counts III and IV, Dupler asserts false arrest/imprisonment and battery claims, respectively, against Sheriff Hunter under Florida law on a theory of <u>respondeat superior</u> liability. <u>Id.</u> ¶¶ 71-88. On March 29, 2016, Sheriff Hunter and Deputy Spradley responded to the allegations, <u>see</u> Answer and Affirmative Defenses (Sheriff Mark Hunter) (Doc. 7; Hunter Answer); Answer and Affirmative Defenses (Keith Spradley) (Doc. 8; Spradley Answer), and in December 2016 filed the instant Motion seeking entry of summary judgment in their favor.

## II.    Standard of Review

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a). The record to be considered on a motion for summary judgment may include "depositions, documents,

electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Rule 56(c)(1)(A).[6]  An issue is genuine when the evidence is such that a reasonable jury could return a verdict in favor of the non-movant.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)). "[A] mere scintilla of evidence in support of the non-moving party's position is insufficient to defeat a motion for summary judgment." Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 2512, 91 L. Ed.2d 202 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to the court, by reference to the record, that there are no genuine issues of material fact to be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  "When a moving party has discharged its burden, the non-moving party must then go beyond the pleadings, and by its own affidavits, or by depositions, answers to

---

[6]    Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 advisory committee's note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Campbell v. Shinseki, 546 F. App'x 874, 879 n.3 (11th Cir. 2013).  "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive." Id.  Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

"Although an unpublished opinion is not binding . . ., it is persuasive authority." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36-2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citations and quotation marks omitted).  Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248, 106 S. Ct. at 2510.  In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## III.    Discussion

### A.  Section 1983 Claim Against Deputy Spradley (Count I)

In Count I, Dupler asserts that Deputy Spradley is liable under Section 1983 for executing a false arrest and using an unreasonable amount of force in violation of his Fourth and Fourteenth Amendment rights.  "In order to prevail on a civil rights action under § 1983, a plaintiff must show that he or she was deprived of a federal right by a person acting under the color of state law."  See Griffin v. City of Opa-Locka, 261 F.3d 1295, 1303 (11th Cir. 2001).  In response to Count I, Deputy Spradley argues that he is entitled to entry of summary judgment because he is immune from suit under the doctrine of qualified immunity.  See generally Motion.

The defense of qualified immunity is available to an official sued in his individual capacity but not to one sued in his official capacity.  See Fitzgerald v. McDaniel, 833 F.2d

1516, 1520 (11th Cir. 1987). Here the Court concludes that Deputy Spradley is sued only in his individual capacity. In the Complaint, although Dupler identifies Sheriff Hunter, both in the caption and in the substantive allegations, as being sued "in his official capacity," see Complaint at 1,2, he makes no similar assertion as to Deputy Spradley, see generally id. Additionally, while Dupler argues that Deputy Spradley is not entitled to qualified immunity based on the facts of this case, he does not suggest that Deputy Spradley is sued in his official capacity such that qualified immunity would be unavailable as a matter of law. See generally Response. As such, the Court will turn to consideration of the parties' respective positions regarding whether Deputy Spradley is entitled to the benefit of qualified immunity based on the facts of this case.

## 1. Qualified Immunity

"Qualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Nolin v. Isbell, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 73 L. Ed.2d 396 (1982)). As a result, the qualified immunity defense protects from suit "'all but the plainly incompetent or those who knowingly violate the law.'"[7] Mullenix v. Luna, 577 U.S. __, 136 S. Ct. 305, 308, 193 L.

---

[7]    Dupler asserts that in the Motion, Defendants rely on an "outdated view of qualified immunity" because they quote "extensively" from Lassiter v. Ala. A&M Univ., Bd. of Trustees, 28 F.3d 1146 (11th Cir. 1994). See Response at 5 (citing Motion at 12-14). Plaintiff is correct that in Hope v. Pelzer, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513, 153 L. Ed.2d 666 (2002), the Supreme Court rejected Lassiter's restrictive view that the facts of prior precedent must be "materially similar" to the facts alleged in a suit to deprive a defendant of qualified immunity. See Hope, 536 U.S. at 739-40, 122 S. Ct. at 2515-16. The Court did not, however, retreat from the established principle that qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341, 106 S. Ct. 1092,

Ed.2d 255 (2015); Carr v. Tatangelo, 338 F.3d 1259, 1266 (11th Cir. 2003), aff'g, 156 F. Supp. 2d 1369 (M.D. Ga. 2001). Indeed, as "'government officials are not required to err on the side of caution,' qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful." Lee v. Ferraro, 284 F.3d 1188, 1200 (11th Cir. 2002) (quoting Marsh v. Butler County, Ala., 268 F.3d 1014, 1031 n.8 (11th Cir. 2001)).[8]

To be entitled to qualified immunity, an official must first establish that his conduct was within the scope of his discretionary authority. See Webster v. Beary, 228 F. App'x 844, 848 (11th Cir. 2007) (per curiam); Lee, 284 F.3d at 1194. In the instant action, Deputy Spradley was plainly acting within his discretionary authority at the time he arrested Dupler.[9] Accordingly, the burden shifts to Dupler to demonstrate that qualified immunity is not appropriate using the two-prong test established by the Supreme Court

---

[8] 1096, 89 L. Ed.2d 271 (1986). Indeed, the Supreme Court has re-affirmed this principle numerous times in recent years. See White v. Pauly, __ U.S. __, 137 S. Ct. 548, 551, 196 L. Ed.2d 463 (2017); Mullenix, 136 S. Ct. at 310; City & Cnty. of San Francisco, Ca. v. Sheehan, 575 U.S. __, 135 S. Ct. 1765, 1174, 191 L. Ed.2d 856 (2015); Ashcroft v. al-Kidd, 563 U.S. 731, 743, 131 S. Ct. 2074, 2085, 179 L. Ed.2d 1149 (2011).

[8] In determining whether a defendant is entitled to qualified immunity, the court views the facts and all reasonable inferences in the light most favorable to the plaintiff to the extent supported by the record and then considers "the legal issue of whether the plaintiff's 'facts,' if proven, show that the defendant violated clearly established law." Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 925 n.3 (11th Cir. 2000); Scott v. Harris, 550 U.S. 372, 381 n.8, 127 S. Ct. 1769, 1776 n.8, 167 L. Ed.2d 686 (2007).

[9] "'A government official acts within [his] discretionary authority if the actions were (1) undertaken pursuant to the performance of [his] duties and (2) within the scope of [his] authority.'" Jones v. City of Atlanta, 192 F. App'x 894, 897 (11th Cir. 2006) (per curiam) (quoting Lenz v. Winburn, 51 F.3d 1540, 1545 (11th Cir. 1995)). Making an arrest is thus a discretionary function for a police officer. See Crosby v. Monroe Cnty., 394 F.3d 1328, 1332 (11th Cir. 2004); see also Lee, 284 F.3d at 1194 (finding that "there can be no doubt that [the officer] was acting in his discretionary capacity when he arrested [the plaintiff]," even though the plaintiff asserted that the officer used excessive force in the manner in which she was arrested).

in <u>Saucier v. Katz</u>, 533 U.S. 194, 201, 121 S. Ct. 2151, 2156, 150 L. Ed.2d 272 (2001).

The first inquiry is, taken in the light most favorable to the non-moving party, "do the facts

alleged show the officer's conduct violated a constitutional right?"  <u>Id.</u>; <u>see also</u> <u>Hope v.

Pelzer</u>, 536 U.S. 730, 736, 122 S. Ct. 2508, 2513, 153 L. Ed.2d 666 (2002); <u>Beshers v.

Harrison</u>, 495 F.3d 1260, 1265 (11th Cir. 2007) (quoting <u>Scott v. Harris</u>, 550 U.S. 372,

377, 127 S. Ct. 1769, 1774, 167 L. Ed.2d 686 (2007)).  If the court finds that a violation

of a constitutional right has been alleged based on the plaintiff's version of the facts, then

the next question is whether the right was clearly established at the time of the violation.[10]

<u>Hope</u>, 536 U.S. at 739, 127 S. Ct. at 2515; <u>Saucier</u>, 533 U.S. at 201, 121 S. Ct. at 2156;

<u>Scott</u>, 550 U.S. at 377, 127 S. Ct. at 1774; <u>Lee</u>, 284 F.3d at 1194.

> [The Eleventh] Circuit uses two methods to determine whether a reasonable officer would know that his conduct is unconstitutional.  The first method looks at the relevant case law at the time of the violation; the right is clearly established if "a concrete factual context [exists] so as to make it obvious to a reasonable government actor that his actions violate federal law."  This method does not require that the case law be "materially similar" to the official's conduct; "officials can still be on notice that their conduct violates established law even in novel factual circumstances."  But, where the law is stated in broad propositions, "a very high degree of prior factual particularity may be necessary."

> The second method looks not at case law, but at the officer's conduct, and inquires whether that conduct "lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to [the officer], notwithstanding the lack of fact-specific case-law."  This method—termed "obvious clarity,"—is a "narrow exception" to the normal rule that only case law and specific factual scenarios can clearly establish a violation.

---

[10]     In <u>Pearson v. Callahan</u>, 555 U.S. 223, 129 S. Ct. 808, 172 L. Ed.2d 565 (2009), the Supreme Court modified the procedure mandated in <u>Saucier</u> permitting trial judges the discretion to determine which prong of the qualified immunity analysis should be resolved first.  <u>See</u> <u>Pearson</u>, 555 U.S. at 236, 129 S. Ct. at 818.

-14-

<u>Fils v. City of Aventura</u>, 647 F.3d 1272, 1291 (11th Cir. 2011) (citations omitted). With respect to the Fourth Amendment, the Supreme Court has cautioned that:

> [t]he dispositive question is "whether the violative nature of <u>particular</u> conduct is clearly established." This inquiry "'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" Such specificity is especially important in the Fourth Amendment context, where the Court has recognized that "[i]t is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."

<u>Mullenix</u>, 136 S. Ct. at 308 (citations omitted) (emphasis and alteration in original).

### 2. False Arrest

Dupler alleges that Deputy Spradley is liable under Section 1983 for executing a false arrest in violation of the Fourth and Fourteenth Amendments. At the outset, the court finds that although the Complaint "contains scattered references to the Fourteenth Amendment," Dupler has not "laid out the elements and stated a claim under that amendment." <u>Signature Pharmacy, Inc. v. P. David Soares</u>, No. 6:08-cv-1853-Orl-31GJK, 2012 WL 1631681, at *2 (M.D. Fla. May 8, 2012). As one jurist of this Court has observed, "[t]he Fourth Amendment was made applicable to states by the Fourteenth Amendment, <u>Mapp v. Ohio</u>, 367 U.S. 643, 81 S. Ct. 1684, 6 L. Ed.2d 1081 (1961), and perhaps this explains the references to both of these Amendments in the Plaintiff['s] pleading." But like the Plaintiff in the <u>Signature Pharmacy</u> case, Dupler has not asserted "an independent Fourteenth Amendment claim." <u>Id.</u> Moreover, also like the Plaintiff in <u>Signature Pharmacy</u>, "it does not appear that [Dupler] could have proceeded under the Fourteenth Amendment even if [ ]he[ ] had wished to do so." <u>Id.</u> As the <u>Signature Pharmacy</u> court explained:

> Clearly, the gravamen of the Amended Complaint was the allegedly
> improper . . . seizures for which the Defendants were responsible. The
> right to be free from unreasonable searches and seizures is protected by
> the Fourth Amendment, rather than the Fourteenth, and where a particular
> Amendment provides an explicit textual source of constitutional protection
> against a particular sort of government behavior, that Amendment, not the
> more generalized notion of substantive due process found in the
> Fourteenth Amendment, must be the guide for analyzing the claim.
> <u>Albright v. Oliver</u>, 510 U.S. 266, 273, 114 S. Ct. 807, 127 L. Ed.2d 114
> (1994). Thus, as to the allegations made in the Amended Complaint, a
> Fourteenth Amendment claim would have been improper.

<u>Id.</u> The case before the Court here is no different. Accordingly, to the extent that Dupler

bases Count I of the Complaint on an independent Fourteenth Amendment claim, the

Motion is due to be granted.

However, "[a]n arrest without a warrant and lacking probable cause violates the

[Fourth Amendment] and can underpin a § 1983 claim . . . ." <u>Brown v. City of Huntsville,</u>

<u>Ala.</u>, 608 F.3d 724, 734 (11th Cir. 2010); <u>see also</u> <u>Jones v. Brown</u>, 649 F. App'x 889, 890

(11th Cir. 2016). A false arrest is "'the <u>unlawful restraint</u> of a person against his will, the

gist of which action is the <u>unlawful detention</u> of the plaintiff and the deprivation of his

liberty.'" <u>Bartley v. Kim's Enter. of Orlando</u>, 568 F. App'x 827, 834 (11th Cir. 2014)

(quoting <u>Escambia Cnty. Sch. Bd. v. Bragg</u>, 680 So.2d 571, 572 (Fla. 1st DCA 1996))

(emphasis provided). Under federal law, an arrest is unlawful when it occurs "without a

warrant and without probable cause." <u>Jones</u>, 649 F. App'x at 890. Contrary to

Defendants' assertion, however, probable cause is not an affirmative defense to a federal

false arrest claim. <u>See</u> Motion at 23. Instead, to prevail on a false arrest claim under

Section 1983, a plaintiff bears the burden of proving the absence of probable cause.

<u>Rankin v. Evans</u>, 133 F.3d 1425, 1436 (11th Cir. 1998).

Under both federal and Florida law,

> [f]or probable cause to exist, . . . an arrest must be objectively reasonable based on the totality of the circumstances. This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.

Lee, 284 F.3d at 1195 (quotation and internal quotation marks and citation omitted). However, "[t]o receive qualified immunity, an officer need not have actual probable cause, but only 'arguable' probable cause." Brown, 608 F.3d at 734. "Whether an officer possesses probable cause or arguable probable cause depends on the elements of the alleged crime and the operative fact pattern." Id. at 735 (citations omitted). As such, the dispositive question for qualified immunity purposes in this action is whether Deputy Spradley had at least arguable probable cause to arrest Dupler for the offenses charged.[11] Id. "Arguable probable cause exists 'where reasonable officers in the same

---

[11]     In wrongful arrest cases, the "clearly established" prong of qualified immunity is framed as an "arguable probable cause" inquiry. See Poulakis v. Rogers, 341 F. App'x 523, 526 (11th Cir. 2009); Case v. Eslinger, 555 F.3d 1317, 1327-28 (11th Cir. 2009) ("Absent evidence that a constitutional violation occurred, we need not consider whether the alleged violation was clearly established; that is, we need not consider whether [the officer] lacked even arguable probable cause."); see also Scarbrough v. Myles, 245 F.3d 1299, 1303 (11th Cir. 2001) (per curiam). In other words, "when an officer violates the Constitution because he lacked probable cause to make an arrest, the officer's conduct may still be insulated under the second prong of qualified immunity if he had 'arguable probable cause' to make the arrest." Id. The Eleventh Circuit explains that:

> [a]n examination of arguable probable cause makes sense under the second prong because the second prong does not ask whether the Constitution was violated. Instead, it asks only whether a reasonable officer was given fair and sufficient notice that what he was doing was unlawful under the circumstances. Simply put, the only question we ask under [the] second prong is whether "[a] reasonable officer[ ] in the same circumstances and possessing the same knowledge as the Defendant[ ] could have believed that probable cause existed to arrest."

Id. at 527 n.2 (quoting Lee, 284 F.3d at 1195; see also Moran v. Cameron, 362 F. App'x 88, 93 (11th Cir. 2010) (addressing the second prong of the Saucier test by asking whether the officer's arrest of the plaintiff "was clearly established as unconstitutional because it lacked arguable probable cause"); Eloy v. Guillot, 289 F. App'x 339, 343 n.5 (11th Cir. 2008) ("The arguable probable cause standard applies in the 'clearly

circumstances and possessing the same knowledge as the Defendant[ ] could have believed that probable cause existed to arrest.'" Lee, 284 F.3d at 1195 (quotation omitted); see also Brown, 608 F.3d at 734. "This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who unreasonably conclude that probable cause exists." Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1137 (11th Cir. 2007).

"'The essence of qualified immunity analysis [as to arguable probable cause] is the public official's objective reasonableness, regardless of his underlying intent or motivation.' 'The standard is an objective one, and therefore does not include an inquiry in the officers' subjective intent or beliefs[,]" which are irrelevant. Rushing v. Parker, 599 F.3d 1263, 1266 (11th Cir. 2010) (per curiam) (internal quotations omitted). Moreover, "[p]olice officers are not expected to be lawyers or prosecutors[,]" and "[a]rguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an arrest[.]" Scarbrough v. Myles, 245 F.3d 1299, 1302-03 n.8 (11th Cir. 2001) (per curiam)(citation omitted). The proper focus is on "whether [the arresting officer] violated clearly established law in making the arrests based on the objective factors that gave rise to his probable-cause determination and not

_____

established law' prong of the qualified immunity analysis."); but see Poulakis, 341 F. App'x at 534-35 (Quist, J., dissenting) (citing Skop v. City of Atlanta, Ga., 485 F.3d 1130 (11th Cir. 2007)); Hawthorne v. Sheriff of Broward Cnty., 212 F. App'x 943, 946-47 (11th Cir. 2007) (holding that because the officer had arguable probable cause for the arrest, the plaintiff failed to show a constitutional violation and the court need not consider the "clearly established" prong of the qualified immunity analysis); Davis v. Williams, 451 F.3d 759, 764 n.8 (11th Cir. 2006) (characterizing the "arguable probable cause" inquiry as addressing the first step of the qualified immunity analysis because "there is no question that the second step-clearly established-is satisfied, as it is clearly established that an arrest made without probable cause violates the Fourth Amendment").

whether the arrestees' actions actually constituted a crime." Id. at 1303 n.8.  Thus, "what counts for qualified immunity purposes relating to probable cause to arrest is the information known to the defendant officers or officials at the time of their conduct, not the facts known to the plaintiff then or those known to a court later." Jones v. Cannon, 174 F.3d 1271, 1283 n.4 (11th Cir. 1999) (collecting cases).

### a. Fleeing or Attempting to Elude a Law Enforcement Officer

Deputy Spradley arrested Dupler for "simple vehicle flight."  See Offense Report at 1; see also United States v. Coronado-Cura, 713 F.3d 597, 598 (11th Cir. 2013). Pursuant to Florida Statute section 316.1935(2), "[a]ny person who willfully flees or attempts to elude a law enforcement officer in an authorized law enforcement patrol vehicle, with agency insignia and other jurisdictional markings prominently displayed on the vehicle, with siren and lights activated commits a felony of the third degree."  "The elements of the crime are: '(1) an officer in a law enforcement patrol vehicle, with its jurisdictional markings prominently displayed and its siren and lights activated, orders the motorist to stop; and (2) the motorist willfully flees or attempts to elude the officer.'" Coronado-Cura, 713 F.3d at 598 (citation omitted).  "[T]he statutory offense of fleeing and eluding does not require the lawfulness of the police action as an element of the offense." State v. McCune, 772 So.2d 596, 597 (Fla. 5th DCA 2000); see also Henderson v. State, 88 So.3d 1060, 1062 (Fla. 1st DCA 2012) ("[A]ppellant's act of fleeing or attempting to elude [the Deputy] . . . obviates the necessity of determining whether there was reasonable suspicion or probable cause for the initial attempt to stop.").  Accordingly, an officer has probable cause to stop an individual for violating section 316.1935(2) of the

Florida Statutes when the officer attempts to pull that individual over, "with lights and sirens activated," and the driver fails to pull over. Henderson, 88 So.3d at 1063.

Here, there is no dispute that Deputy Spradley satisfied the first element, as he turned his emergency lights on as soon as the traffic light at the corner of Country Club Road and County Road 252 turned green, and activated "a quick siren."[12] See Spradley Dep. at 13, 16. Despite this, Dupler contends that Deputy Spradley did not have probable cause to believe that Dupler willfully fled because he, Dupler, did not speed or alter his course. See Response at 8-9. This argument is unavailing for at least two reasons. First, one need not violate any traffic law during a pursuit in order to commit simple vehicle flight. See Walker v. City of Riviera Beach, 212 F. App'x 835, 836 n.1, 839 (11th Cir. 2006) (finding that an officer had probable cause to arrest a driver for simple vehicle flight when the driver "did not immediately pull over when [the officer] flashed his lights and shouted for [the driver] to yield."); Henderson, 88 So.3d at 1062 (affirming a defendant's conviction because even though "[a]ppellant did not speed or violate any traffic laws before he pulled over, . . . he did not stop until there were officers approaching him from the opposite direction."); State v. Kirer, 120 So.3d 60, 61, 64 (Fla. 4th DCA 2013) (finding that an officer had probable cause for simple vehicle flight even though during the pursuit "[n]either appellee nor the deputy went over approximately '10 miles an hour.'"); Ward v. State, 59 So.3d 1220, 1221 (Fla. 4th DCA 2011) (upholding the simple vehicle flight

---

[12]     The fact that Deputy Spradley gave a "quick siren," rather than a fully activated siren, does not strip him of probable cause. See Diaz v. State, 548 So.2d 843, 844 (Fla. 3d DCA 1989) ("[O]nce the detectives had activated their blue emergency lights, [the driver] was obliged to stop. His failure to do so violated section 316.1935, Florida Statutes. . ."); Moore v. State, 561 So.2d 625, 627 (Fla. 1st DCA 1990) ("Because appellant's failure to stop after officers activated their blue emergency lights violated section 316.1935, Florida Statutes, officers had probable cause to arrest appellant. . .").

conviction of a driver who failed to stop when multiple police officers pursued him for approximately ten to twenty blocks, even though the officers "conceded that [the defendant] did not . . . commit any traffic infractions. . ."). Therefore, the fact that Dupler did not speed, commit any traffic infractions, or violate any other law during the pursuit does not negate the existence of probable cause to believe he was violating section 316.1935(2) of the Florida Statutes.

Second, probable cause exists "'when 'the facts and circumstances <u>within the officer's knowledge</u>, . . . would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.'" <u>Lee</u>, 284 F.3d at 1195 (citations omitted) (emphasis provided). Thus, even if the Court accepts that Dupler did not willfully flee from Deputy Spradley because he did not hear Deputy Spradley's siren over his music or notice Deputy Spradley's emergency lights, <u>see</u> Dupler Dep. at 27-29, 37, the Court must consider how Dupler's actions would have appeared to a reasonable officer in Deputy Spradley's position. From Deputy Spradley's perspective, he was driving immediately behind a vehicle such that there was no obstruction in the vehicle driver's line of sight, and it was nighttime, such that his lights would be readily visible. He turned on his emergency lights and activated his siren, albeit briefly. Dupler, the driver in the car ahead, did not stop and continued driving past areas that would have accommodated a stop, even turning onto another road, into a driveway and continuing to the end of that driveway. With that knowledge Deputy Spradley reasonably believed, even if incorrectly based on Dupler's explanation, that Dupler intentionally failed to pull over. Indeed, a reasonable officer in

Deputy Spradley's position could have assumed that Dupler saw his emergency lights and heard his siren. <u>See</u> Spradley Dep. at 13, 16. Accordingly, the Court finds that Deputy Spradley had actual probable cause to arrest Dupler for simple vehicle flight under section 316.1935(2) of the Florida Statutes. As such, Dupler failed to allege a constitutional violation with respect to this charge.

### b. Opposing an Officer Without Violence

Deputy Spradley also arrested Dupler for opposing Deputy Spradley without violence. <u>See</u> Offense Report at 1. Pursuant to section 843.02 of the Florida Statutes, "[w]hoever shall resist, obstruct, or oppose any officer . . . without offering or doing violence to the person of the officer, shall be guilty of a misdemeanor of the first degree . . ." The elements of this offense are: "(1) the officer was engaged in the lawful execution of a legal duty; and (2) the [suspect]'s action, by his words, conduct, or a combination thereof, constituted obstruction or resistance of a lawful duty." <u>C.E.L. v. State</u>, 24 So.3d 1181, 1185-86 (Fla. 2009). Deputy Spradley arrested Dupler for violating this statute because Dupler resisted Deputy Spradley's commands to get out of his vehicle and get on the ground. <u>See</u> Spradley Dep. at 48-50.

The Court need not determine whether Deputy Spradley had arguable probable cause to arrest Dupler for resisting without violence because "so long as probable cause existed to arrest [Dupler] for any offense, the arrest and detention are valid even if probable cause was lacking as to some offenses, or even all announced charges." <u>Whittington v. Town of Surfside</u>, 490 F. Supp. 2d 1239, 1251 (S.D. Fla. 2007). "Quite simply, '[t]he validity of an arrest does not turn on the offense announced by the officer at

the time of the arrest.'" <u>Lee</u>, 284 F.3d at 1195-96 (citation omitted). "Indeed, '[w]hen an officer makes an arrest, which is properly supported by probable cause to arrest for a certain offense, neither his subjective reliance on an offense for which no probable cause exists nor his verbal announcement of the wrong offense vitiates the arrest.'" <u>Id.</u> at 1196 (citation omitted). Accordingly, because Deputy Spradley had actual cause to arrest Dupler for violating section 316.1935(2) of the Florida Statutes, Deputy Spradley is entitled to qualified immunity for any false arrest claims brought under Section 1983 in this action.

### 3. Excessive Force

In Count I, Dupler also asserts that Deputy Spradley is liable under Section 1983 for executing his arrest with excessive force in violation of the Fourth and Fourteenth Amendments. <u>See</u> Complaint ¶¶ 56-60. As a preliminary matter, the Court finds that Dupler's claim must be analyzed under the Fourth Amendment rather than the Fourteenth. According to the Supreme Court:

> <u>all</u> claims that law enforcement officers have used excessive force— deadly or not—in the course of arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard, rather than under a "substantive due process" approach. Because the Fourth Amendment provides an explicit textual source of constitutional protection against this sort of physically intrusive governmental conduct, that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.

<u>Graham v. Connor</u>, 490 U.S. 386, 395, 109 S. Ct. 1865, 1871, 104 L. Ed.2d 443 (1989).

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force during the course

of a criminal apprehension." <u>Oliver v. Fiorino</u>, 586 F.3d 898, 905 (11th Cir. 2009). However, "'Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" <u>Vinyard v. Wilson</u>, 311 F.3d 1340, 1347 (11th Cir. 2002) (citation omitted). Indeed, the Eleventh Circuit recognizes that "the typical arrest involves some force and injury." <u>See</u> <u>Rodriguez v. Farrell</u>, 280 F.3d 1341, 1350 (11th Cir. 2002). "A constitutional violation only occurs when the officer's use of force is 'objectively unreasonable' in light of the totality of the circumstances at the time the force is used." <u>Glover v. Eighth Unknown D.E.A. Agents/Drug Task Force Agents from Birmingham, Ala. Task Force</u>, 225 F. App'x 781, 785-86 (11th Cir. 2007) (citation omitted).

In evaluating a claim of excessive force, courts must use a "standard of reasonableness at the moment." <u>Graham</u>, 490 U.S. at 396, 109 S. Ct. at 1872.

> We do not sit in judgment to determine whether an officer made the best or a good or even a bad decision in the manner of carrying out an arrest. The Court's task is only to determine whether an officer's conduct falls within the outside borders of what is reasonable in the constitutional sense.

<u>Buckley v. Haddock</u>, 292 F. App'x 791, 794 (11th Cir. 2008). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." <u>Graham</u>, 490 U.S. at 396-97, 109 S. Ct. at 1872. "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than

-24-

with the 20/20 vision of hindsight." Id. at 396, 109 S. Ct. at 1872. Because "reasonableness" cannot be defined precisely or applied mechanically, the Supreme Court has instructed that:

> its proper application requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether [the suspect] is actively resisting arrest or attempting to evade arrest by flight.

Id.; see also Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993), modified, 14 F.3d 583 (11th Cir. 1994). A court uses these factors, referred to as the Graham factors, to analyze the reasonableness of an officer's use of force. See Lee, 284 F.3d at 1198. In this regard the Eleventh Circuit instructs that "Graham dictates unambiguously that the force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." Id. In addition to the Graham factors, the Eleventh Circuit has also set forth the following considerations for determining if force was reasonable: "(1) the need for the application of force, (2) the relationship between the need and amount of force used, and (3) the extent of the injury inflicted." Vinyard, 311 F.3d at 1347 (citing Lee, 284 F.3d at 1197-98). Significantly, "an officer will be entitled to qualified immunity . . . if an objectively reasonable officer in the same situation could have believed that the force used was not excessive." Vinyard, 311 F.3d at 1346.

Dupler argues that Deputy Spradley was not authorized to use any force because Dupler's arrest was unlawful. See Response at 13-14. However, the Court need not address this argument because Deputy Spradley lawfully arrested Dupler. See supra

Section III.A.2.[13]  Thus, the Court will address whether there is a genuine dispute of material fact with respect to whether Deputy Spradley applied an unreasonable amount of force by analyzing the Graham factors.  The Court will begin its analysis by discussing the reasonableness of Deputy Spradley's successful deployment of his Taser.  Then, the Court will determine whether Deputy Spradley unreasonably stomped on Dupler's back once he was already on the ground,[14] and attempted to deploy his Taser a second time.

In assessing the reasonableness of Deputy Spradley's use of his Taser, the Court must apply the Graham factors to the unique facts and circumstances present in this case.  Based on the totality of the circumstances, the Court is of the view that Deputy Spradley deployed a reasonable amount of force.  Although Plaintiff correctly asserts that using force on a non-violent, non-resistant suspect would be constitutionally excessive, see Response at 14-15, that is not the situation before the Court.  Here, there is no genuine dispute that a reasonable officer in Deputy Spradley's position could have believed that Dupler posed a threat and that deployment of a Taser was a proportionate response.  In the Eleventh Circuit, "noncompliance or continued physical resistance to arrest justifies" the use of a Taser, Barfield v. Rambosk, 641 F. App'x 845, 848 (11th Cir. 2015), even when the suspect is unarmed, Smith v. LePage, 834 F.3d 1285, 1295 (11th Cir. 2016).

---

[13]     Notably, even if Dupler's arrest were unlawful, "'[u]nder [Eleventh] Circuit[ ] law . . . a claim that any force in an illegal stop or arrest is excessive is subsumed in the illegal stop or arrest claim and is not a discrete excessive force claim.'"  Bashir v. Rockdale Cnty., Ga., 445 F.3d 1323, 1331 (11th Cir. 2006) (citation omitted).  That is, "[a] genuine 'excessive force' claim relates to the manner in which an arrest was carried out, independent of whether law enforcement had the power to arrest."  Hadley v. Gutierrez, 526 F.3d 1324, 1329 (11th Cir. 2008).

[14]     Although Deputy Spradley disputes Dupler's characterization of this act as a "stomping," see Dupler Dep. at 42; Spradley Dep. at 30, on summary judgment, the Court must accept the non-movant's version of the facts as true, see Haves, 52 F.3d at 921.

In fact, "'where a suspect appears hostile, belligerent, and uncooperative, use of a taser might be preferable to a physical struggle causing serious harm to the suspect or the officer.'" Id. at 1294 (citations omitted); see also Zivojinovich v. Barner, 525 F.3d 1059, 1073 (11th Cir. 2008) (finding that officers reasonably tased a handcuffed detainee who violently resisted arrest and continued to struggle); Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004) (permitting an officer to deploy his Taser against an unarmed and non-violent arrestee who failed to follow reasonable instructions). The undisputed material facts before the Court reflect that Dupler failed to follow Deputy Spradley's orders, such that Deputy Spradley's use of his Taser was not unconstitutional.

Significantly, the incident began with a vehicle pursuit. As noted, a reasonable officer in Deputy Spradley's position could have believed that Dupler intentionally failed to pull over because he drove by several areas that would have accommodated a stop even though Deputy Spradley followed closely behind him, turned on his emergency lights which were readily visible at night, and activated his siren. See Video at 1:11:18-1:12:18; Spradley Dep. at 13, 16. As explained by the Supreme Court, "[t]he attempt to elude capture is a direct challenge to an officer's authority" and "gives the officer reason to believe that the [suspect] has something more serious than a traffic violation to hide." Sykes v. United States, 564 U.S. 1, 9, 131 S. Ct. 2267, 2273, 180 L. Ed.2d 60 (2011), overruled on other grounds, Johnson v. United States, __U.S.__, 135 S. Ct. 2551, 192 L. Ed.2d 569 (2015). As such, "once the pursued vehicle is stopped, it is sometimes necessary for officers to approach with guns drawn to effect arrest. Confrontation with police is the expected result of vehicle flight." Id. at 10, 131 S. Ct. at 2274.

Escalating matters even more, when Dupler arrived at his home, he did not stop his vehicle until he reached the very end of his driveway and parked in between a carport on his right and a neighboring structure on his left. <u>See</u> Video at 1:12:04-1:12:18. Once Dupler parked, he honked his horn twice. <u>See</u> Spradley Dep. at 19-20. Deputy Spradley had no way of knowing, as Dupler explains, that Dupler frequently did this to let his wife know he was home, <u>see</u> Dupler Dep. at 35, and feared that Dupler honked his horn "to get other people to come outside," <u>see</u> Spradley Dep. at 36-37. The area was not well lit and Deputy Spradley was alone without knowledge of when his back-up might arrive. <u>Id.</u> at 36-37. Deputy Spradley believed, as a reasonable officer would, that until his backup arrived, the safest approach was to get Dupler "outside of his vehicle, outside of possible weapons or explosives or anything that he may have inside his vehicle, outside on the ground, laying down on his stomach." <u>Id.</u>

Intensifying matters, Dupler failed to adhere to Deputy Spradley's orders to show his hands in a timely manner. Although Dupler testified that he complied with Deputy Spradley's order right away, <u>see</u> Dupler Dep. at 38-39, he also testified that he initially thought he was supposed to wait in his car, <u>id.</u> Nevertheless, the Video establishes that Deputy Spradley ordered Dupler to show his hands four times within twenty seconds before Dupler even began to get out of his vehicle. <u>See</u> Video at 1:12:23-1:12:43. "Where [a] video obviously contradicts Plaintiff's version of the facts, we accept the video's depiction instead of Plaintiff's account." <u>Pourmoghani-Esfahani v. Gee</u>, 625 F.3d 1313, 1315 (11th Cir. 2010) (citing <u>Scott</u>, 550 U.S. at 380-81, 127 S. Ct. at 1776) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the

record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."). When Dupler finally got out of his vehicle, Deputy Spradley repeatedly ordered him to get on the ground. <u>See</u> Video at 1:12:54. Rather than complying, Dupler kept asking what he had done wrong. <u>Id.</u> Because of Dupler's failure to follow Deputy Spradley's order, Deputy Spradley approached Dupler and deployed his Taser. <u>Id.</u> at 1:12:55-1:13:00. Deputy Spradley acknowledged that Dupler was not holding any weapons when he finally held up his palms. <u>See</u> Spradley Dep. at 28-29. Indeed, Dupler's lack of visible arms was the very reason that Deputy Spradley used his Taser instead of his firearm. <u>Id.</u>

As a result of Deputy Spradley's Taser use, Dupler has experienced more frequent seizures, back trauma, numbness in his left leg, red marks from the Taser probes, and emotional injuries. <u>See</u> Dupler Dep. at 40-41, 44, 46-47, 53; R. Dupler Dep. at 22. However, to the extent that Dupler suffered more severe injuries because of his history of complex partial seizures, the Court notes that "reasonable force does not become excessive force when the force aggravates (however severely) a pre-existing condition the extent of which was unknown to the officer at the time." <u>Rodriguez</u>, 280 F.3d at 1353. Mrs. Dupler did not inform Deputy Spradley that Dupler suffers from seizures until after Deputy Spradley had deployed his Taser. <u>See</u> R. Dupler at 16; Video at 1:13:26. "'Significantly, and unfortunately, [Dupler] never communicated his medical problem to Deputy Spradley" before Deputy Spradley deployed his Taser. <u>Barfield</u>, 641 F. App'x at 848. The Court must "not use hindsight to judge the acts of police officers; we look at

what they knew (or reasonably should have known) at the time of the act." <u>Rodriguez</u>, 280 F.3d at 1352-53.

Therefore, based on the specific facts of this case, the Court finds that Deputy Spradley's deployment of his Taser was not constitutionally excessive. In light of the vehicle pursuit, Dupler's horn honking, the late hour and poor lighting, the fact that Deputy Spradley was by himself, and most importantly, Dupler's failure to comply with Deputy Spradley's orders in a timely manner, Deputy Spradley reasonably believed that he was in a high risk situation. A reasonable officer in Deputy Spradley's situation could have believed that deploying a Taser was a proportionate response. Indeed, the facts of this case appear similar to those in <u>Draper</u>, 369 F.3d at 1272-74. There an officer deployed his taser against an individual who repeatedly failed to comply with the officer's orders. <u>Id.</u> at 1273-74. The Eleventh Circuit states that the officer's "use of the taser gun to effectuate the arrest . . . was reasonably proportionate to the difficult, tense and uncertain situation that [the officer] faced in this traffic stop, and did not constitute excessive force." <u>Id.</u> at 1278. Here, the Court similarly concludes that Dupler's Fourth Amendment rights were not infringed by Deputy Spradley's first Taser deployment.

Next, the Court will assess the reasonableness of Deputy Spradley's conduct when he placed his foot on Dupler's back to bring him fully to the ground. Ultimately, the Court finds that this force was <u>de minimis</u>, and therefore constitutional. In the Eleventh Circuit, "the application of <u>de minimis</u> force, without more, will not support a claim for excessive force in violation of the Fourth Amendment." <u>Nolin</u>, 207 F.3d at 1257. In determining whether force is <u>de minimis</u>, courts consider the nature of the injury. <u>See</u> <u>Jones v. City</u>

of Dothan, Ala., 121 F.3d 1456, 1460 (11th Cir. 1997) (noting that the use of force is not excessive if "the actual force used and the injury inflicted [a]re both minor in nature."). Here, although Deputy Spradley's stomping was temporarily painful, Dupler has not produced any evidence to suggest that it caused prolonged discomfort.

Additionally, to determine whether a use of force is excessive courts consider whether the suspect was compliant and whether the officer detained the person prior to using force.  See Gomez v. United States, 601 F. App'x 841, 850 (11th Cir. 2015) ("[T]he application of gratuitous force on an already-handcuffed and compliant detainee or arrestee constitutes excessive force in violation of the Fourth Amendment, even if there is no visible or compensable injury.").  Indeed, in the Eleventh Circuit, "a variety of physical force techniques used by police on unhandcuffed individuals constitute[ ] de minimis force that do[ ] not rise to excessive force that could violate the Fourth Amendment."  Id.  For example, in Croom v. Balkwill, 645 F.3d 1240, 1245, 1252 (11th Cir. 2011), the Eleventh Circuit held that force used against an elderly, arthritic, but not detained, woman was de minimis.  There, the officer ran up to her, "scream[ed] for her to 'hit the ground,'" and "[w]hen [she] was unable to comply," pushed her to the ground and placed a foot on her back.  Id. at 1245.  According to the court the force was de minimis and appropriate to gain control over the situation.  Id. at 1252-53; see also Myers v. Bowman, 713 F.3d 1319, 1328 (11th Cir. 2013) (finding that force was de minimis where an officer "grabbed [the plaintiff] by the arm, forced him to the ground, placed him in handcuffs, and searched him."); Nolin, 207 F.3d at 1255 (finding that an officer used de minimis force when he "grabbed [the plaintiff] from behind by the shoulder and wrist, threw him against a van

three or four feet away, kneed him in the back and pushed his head into the side of the van, searched his groin area in an uncomfortable manner, and handcuffed him."); Post, 7 F.3d at 1559-60 (finding that even though it was unnecessary for an officer to push the plaintiff against the wall after he had been handcuffed, "the amount of force [the officer] used, even if unnecessary," did not plainly violate the law).

Here, there is no genuine dispute that Dupler had not yet complied with Deputy Spradley's commands and had not been detained when Deputy Spradley placed his foot on Dupler's back. Indeed, Deputy Spradley used his foot to bring Dupler to the ground to aid his efforts to detain and arrest Dupler. "Therefore, [Dupler]'s allegations are 'most closely analogous to the line of cases in which [the Eleventh Circuit] has held that the amount of force used on unhandcuffed individuals was de minimis and did not rise to excessive force that could violate the Fourth Amendment.'" Tarpley v. Miami-Dade Cnty., 212 F. Supp. 3d 1273, 1283 (S.D. Fla. 2016) (quoting Gomez, 601 F. App'x at 851). Accordingly, there is no genuine dispute of material fact regarding the reasonableness of Deputy Spradley's use of his foot to bring Dupler to the ground. The Court finds that this was not constitutionally excessive.

Finally, the Court will assess the reasonableness of Deputy Spradley's attempt to deploy his Taser a second time. Ultimately, the Court concludes that this too was de minimis. Although Dupler testified that Deputy Spradley deployed his Taser three times, see Dupler Dep. at 42, the parties agree in their papers that Deputy Spradley successfully deployed his Taser once, and unsuccessfully attempted to deploy his Taser a second time, see Motion at 17-18; Response at 17. Because Deputy Spradley did not

-32-

successfully deploy the Taser a second time, he did not actually use any force, let alone excessive force. Dupler had not yet been detained when Deputy Spradley attempted to deploy his Taser a second time, and Dupler could not have suffered any injuries from this unsuccessful deployment. The Court notes that Plaintiff has not presented any authority to suggest that an attempted but unsuccessful use of force, by itself, could give rise to a constitutional violation. Accordingly, the Court finds that Dupler's constitutional rights were not infringed on the basis of this attempted Taser deployment.

In consideration of the foregoing, the Court finds that to the extent Defendants seek entry of summary judgment with respect to Count I of the Complaint, the Motion is due to be granted. The undisputed material facts establish that Deputy Spradley did not violate Dupler's Fourth Amendment Rights. Accordingly, there is no need to determine whether the law regarding this incident was clearly established.

### B. Section 1983 Claim Against Sheriff Hunter (Count II)

In Count II, Dupler brings a Section 1983 claim against Sheriff Hunter in his official capacity based on his alleged failure "to institute policies, practices and procedures to ensure against the unlawful arrest and abusive treatment of innocent persons" in violation of the Fourth and Fourteenth Amendments. See Complaint ¶¶ 61-70. "'For liability purposes, a suit against a public official in his official capacity is considered a suit against the local governmental entity he represents.'" Vineyard v. Cnty. of Murray, Ga., 990 F.2d 1207, 1210 n.3 (11th Cir. 1993) (citation omitted), cert. denied, 510 U.S. 1024, 114 S. Ct. 636, 126 L. Ed.2d 594 (1993). Therefore, Dupler's claim against Sheriff Hunter in his official capacity is a claim against Columbia County.

When suing local officials in their official capacities under § 1983, the plaintiff has the burden to show that a deprivation of constitutional rights occurred as a result of an official government policy or custom. "A policy is a decision that is officially adopted by the municipality, or created by an official of such rank that he or she could be said to be acting on behalf of the municipality. A custom is a practice that is so settled and permanent that it takes on the force of law." "Only those officials who have final policymaking authority may render the municipality liable under § 1983." "[S]tate and local positive law" determine whether a particular official has final policymaker authority for § 1983 purposes.

Cooper v. Dillon, 403 F.3d 1208, 1221 (11th Cir. 2005) (citations omitted); see also Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694, 98 S. Ct. 2018, 2037, 56 L. Ed.2d 611 (1978) (holding that a local government is liable under Section 1983 when one of its agents inflicts an injury while executing a government policy or custom).

In the absence of a constitutional violation, Dupler's claim against Sheriff Hunter and Columbia County must fail, as there is no basis for municipal liability under Section 1983. See City of Los Angeles v. Heller, 475 U.S. 796, 799, 106 S. Ct. 1571, 1573, 89 L. Ed.2d 806 (1986) ("If a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have authorized the use of constitutionally excessive force is quite beside the point."); Rooney v. Watson, 101 F.3d 1378, 1381 (11th Cir. 1996) ("[A]n inquiry into a governmental entity's custom or policy is relevant only when a constitutional deprivation has occurred."); Vineyard, 990 F.2d at 1211 ("Only when it is clear that a violation of specific rights has occurred can the question of § 1983 municipal liability for the injury arise."). In Section III.A.3, the Court has determined that Deputy Spradley did not violate Dupler's constitutional rights. As such, to the extent Defendants seek entry of summary judgment with respect to Count II of the Complaint, the Motion is due to be granted.

**C. Claims Against Sheriff Hunter Under Florida Law (Counts III and IV)**

Having determined that summary judgment is due to be granted in favor of Defendants as to Dupler's federal claims, the Court next considers whether to continue to exercise supplemental jurisdiction over the remaining state law claims. At the time the instant case was filed, the Court had original jurisdiction over the federal claims, see 28 U.S.C. § 1331, as well as supplemental jurisdiction over Dupler's state law claims, see 42 U.S.C. § 1367(a). See United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S. Ct. 1130, 1138, 16 L. Ed.2d 218 (1966). However, § 1367(c)(3) gives a court discretion to dismiss or remand to state court claims before it on the basis of supplemental jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). Indeed, the Eleventh Circuit has indicated that a district court may properly decline to exercise jurisdiction over supplemental state law claims when the federal claims over which the Court had original jurisdiction are dismissed on a motion for summary judgment, as is the case here. See Murphy v. Fla. Keys Elec. Co-op Ass'n, Inc., 329 F.3d 1311, 1320 (11th Cir. 2003) (affirming summary judgment on defendant's contribution claim invoking admiralty jurisdiction, and affirming dismissal of third-party defendant's state law counterclaim under 28 U.S.C. § 1367(c)); Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999) ("If no federal claim survives summary judgment, the court sees no reason why the other claims should not be dismissed or remanded pursuant to 28 U.S.C. § 1367(c)(3)."); Eubanks v. Gerwen, 40 F.3d 1157, 1162 (11th Cir. 1994) (stating that since the "federal claims [had] been disposed of rather early on at the summary judgment phase[,] . . . comity suggests that the remaining state law

malicious prosecution claim should be heard in state court"); see also Maschmeier v. Scott, 508 F. Supp. 2d 1180, 1185-86 (M.D. Fla. 2007) (declining to exercise supplemental jurisdiction over the plaintiff's state law claim after granting summary judgment in favor of the defendant on the plaintiff's federal claims).

In deciding whether to exercise supplemental jurisdiction over state law claims, district courts consider "the circumstances of the particular case, the nature of the state law claims, the character of the governing state law, and the relationship between the state and federal claims," as well as "the values of judicial economy, convenience, fairness, and comity." City of Chicago v. Int'l Coll. of Surgeons, 522 U.S. 156, 173, 118 S. Ct. 523, 534, 139 L. Ed.2d 525 (1997) (internal quotations omitted) (citing Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350, 108 S. Ct. 614, 619, 98 L. Ed.2d 720 (1988)). "[W]hen the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice." Cohill, 484 U.S. at 350, 108 S. Ct. at 619 (citing Gibbs, 383 U.S. at 726-27, 86 S. Ct. at 1139) (footnote omitted); Gibbs, 383 U.S. at 726, 86 S. Ct. at 1139 ("Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well."); see also Raney v. Allstate Ins. Co., 370 F.3d 1086,1089 (11th Cir. 2004) (stating that the Eleventh Circuit has "encouraged district courts to dismiss any remaining state claims when . . . the federal claims have been dismissed prior to trial") (citing L.A. Draper & Son v. Wheelabrator-Frye, Inc., 735 F.2d 414, 428 (11th Cir. 1984)).  Notably, the Supreme

Court's directive in <u>Cohill</u> concerning when a district court should decline to continue to exercise supplemental jurisdiction "was not intended to 'establish a mandatory rule to be applied inflexibly in all cases,'" but "it did establish a general rule to be applied in all but extraordinary cases." <u>Carr v. Tatangelo</u>, 156 F. Supp. 2d 1369, 1380 (M.D. Ga. 2001) (citing <u>Cohill</u>, 484 U.S. at 350 n.7, 108 S. Ct. at 619 n.7), <u>aff'd</u>, 338 F.3d 1259 (11th Cir. 2003). Moreover, because "[s]tate courts, not federal courts, should be the final arbiters of state law," dismissal of state law claims is strongly encouraged when federal claims are dismissed prior to trial. <u>Baggett v. First Nat'l Bank of Gainesville</u>, 117 F.3d 1342, 1353 (11th Cir. 1997).

Here, the Court has determined that summary judgment in favor of Defendants is proper with regard to Dupler's federal claims. Because all federal claims have been dismissed prior to trial, the Court has the authority under § 1367(c) to decline to retain jurisdiction over the remaining state law claims. <u>See</u> <u>Murphy</u>, 329 F.3d at 1320; <u>Carr</u>, 156 F. Supp. 2d at 1380 (dismissing state law claims without prejudice after finding the defendants to be entitled to qualified immunity as to the federal claims and noting that it is preferable for state courts to "make rulings on issues of state law."). However, before determining whether to do so, since the statute of limitations for each of Dupler's state law claims is four years, <u>see generally</u> Fla. Stat. § 95.11(3)(o),[15] and the claims arose in May 2012, the Court considers the effect of § 1367's tolling provision on Dupler's ability to pursue the claims. This provision states:

---

[15]     With certain exceptions not applicable here, Florida law provides a four year statute of limitations for claims of "assault, battery, false arrest, malicious prosecution, malicious interference, false imprisonment, or any other intentional tort. . . ." Fla. Stat. § 95.11(3)(o).

The period of limitations for any claim asserted under subsection (a), and for any other claim in the same action that is voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless State law provides for a longer tolling period.

28 U.S.C. § 1367(d). Under common law principles of pendent jurisdiction, a district court's dismissal of pendent claims (now referred to as supplemental claims) when the state statute of limitations had expired was considered an abuse of discretion. See Edwards v. Okaloosa Cnty., 5 F.3d 1431,1433 n.1, 1435 (11th Cir. 1993) (holding that it was an abuse of discretion to dismiss pendent state law claims where the state statute of limitations had run during the federal litigation, but noting that if 28 U.S.C. § 1367 were applicable, subsection (d) would toll the Florida statute of limitations, preserving the plaintiff's state law claim). In 1990 Congress enacted 28 U.S.C. § 1367 in which it codified the doctrines of pendant and ancillary jurisdiction under the name supplemental jurisdiction. Palmer v. Hosp. Auth. of Randolph Cnty., 22 F.3d 1559, 1562 n.3 (11th Cir. 1994). In doing do, Congress included subsection (d) of 28 U.S.C. § 1367 "[t]o prevent the limitations period on such supplemental claims from expiring while the plaintiff was fruitlessly pursuing them in federal court." Jinks v. Richland Cnty., S.C., 538 U.S. 456, 459, 123 S. Ct. 1667, 1669, 155 L. Ed.2d 631 (2003). Consequently, § 1367(d) tolls the statute of limitations for supplemental state law claims while they are pending in federal court. See Gainor v. Douglas Cnty., Ga., 59 F. Supp. 2d 1259, 1296 (N.D. Ga. 1998) (holding that since § 1367(d) applied, the "plaintiff's state law claims [were not] barred by Georgia's applicable statute of limitations, as the limitation period [was] tolled while [those] claims [were] pending before [that] [c]ourt"). Upon the filing of this action, the

Court exercised supplemental jurisdiction under § 1367(a) over Dupler's state law claims. Thus, § 1367(d) functions to toll the statute of limitations on those claims during the pendency of this action, and Dupler may re-file them in state court if he wishes to do so. See Jinks, 538 U.S. at 463-64, 123 S. Ct. at 1672 (stating that § 1367(d) provides the "assurance that state-law claims asserted under § 1367(a) will not become time barred while pending in federal court").

Since the Court has determined that Florida's applicable statute of limitations presents no impediment to Dupler's ability to pursue his state law claims in state court, the Court declines to continue to exercise supplemental jurisdiction as to those claims. Upon determining that it has the discretion under § 1367(c) to decline jurisdiction, "[a district court] should consider the traditional rationales for pendent jurisdiction, including judicial economy and convenience in deciding whether or not to exercise that jurisdiction." Palmer, 22 F.3d at 1569. Here, the Court finds that judicial economy and convenience would not be served by retaining jurisdiction over Dupler's state law claims. The Court has concluded that summary judgment is due to be granted to Defendants in regards to Dupler's federal claims in Counts I and II of the Complaint, over which the Court has original jurisdiction. What remains are uniquely state law claims that are best addressed by the state courts. When, as here, a plaintiff's federal claims are eliminated prior to trial, district courts are encouraged "to dismiss any remaining state claims." Murphy v. City of Aventura, 383 F. App'x 915, 919 (11th Cir. 2010) (affirming dismissal of state law claims following entry of summary judgment against plaintiff on the federal employment law claims, and noting that the court, the Eleventh Circuit, encourages district courts to take

such action) (citing <u>Raney</u>, 370 F.3d at 1089); <u>see also</u> <u>Cohill</u>, 484 U.S. 343 at 350 n.7, 108 S. Ct. at 619 n.7 ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine- judicial economy, convenience, fairness, and comity- will point toward declining to exercise jurisdiction over the remaining state-law claims."). As such, the Court declines to continue to exercise supplemental jurisdiction over Counts III and IV of the Complaint, and these counts are due to be dismissed without prejudice.

IV.     **Conclusion**

In light of the foregoing, it is

**ORDERED**:

1. Defendant's Motion for Final Summary Judgment (Doc. 21) is **GRANTED, in part, and DENIED, in part.**

2. The Motion is granted with respect to Counts I and II of the Complaint, and the Clerk of the Court is directed to enter **JUDGMENT** in favor of Defendants Mark Hunter, Sheriff of Columbia County, Florida, in his official capacity, and Keith Spradley, and against Plaintiff John Dupler as to these counts.

3. The Motion is denied as to Counts III and IV of the Complaint. In the exercise of its discretion under 28 U.S.C. § 1367(c), the Court declines to continue to exercise jurisdiction over these claims, and Counts III and IV are **dismissed without prejudice** to Dupler refiling those claims in state court if he so chooses.

4. The Clerk of the Court is directed to terminate all remaining pending motions and deadlines as moot and close the file.

**DONE AND ORDERED** at Jacksonville, Florida on August 11, 2017.

MARCIA MORALES HOWARD
United States District Judge

lc25
Copies to:
Counsel of Record